UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALEXIS RODRIGUEZ,<br><br>PLAINTIFF<br><br>- AGAINST -<br><br>THE CITY OF NEW YORK, CRAIG O'CONNOR, THERESA CARAGINE, J. DOE #1 a/k/a "SH", and DET. GEORGE LOPEZ,<br><br>DEFENDANTS. | **<u>COMPLAINT AND JURY DEMAND</u>**<br><br>26 Civ. 5062 |

Plaintiff Alexis Rodriguez by his attorneys, ZMO Law PLLC, complaining of the Defendants, respectfully alleges as follows based on information and belief:

## PRELIMINARY STATEMENT

1. This is an action for compensatory damages, punitive damages and attorney fees pursuant to 42 U.S.C. § 1983 *et seq.* arising out of the wrongful conviction of the plaintiff, Alexis Rodriguez, who served more than seven additional years in jail and prison for an attempted sexual assault before being exonerated in November 2023. Mr. Rodriguez was framed by officials of the New York City Office of the Chief Medical Examiner ("OCME") and a New York City Police Department ("NYPD") detective who fabricated DNA evidence and a false identification procedure in order to secure his conviction. The only evidence purporting to link Mr. Rodriguez to the crime was DNA found on the victim's glove. The results of the DNA testing and the testimony at trial were deliberately manipulated by the lab

analysts working for OCME, Craig O'Connor, Theresa Caragine, and a person with the initials "SH" (collectively, "OCME Defendants"), to mislead the prosecution and the jury into believing that they found DNA from Mr. Rodriguez on the victim's right glove. They did not.

2. On January 12, 2010, 22-year-old Alicia Renoj Hernandez was walking from the train to work in a residential area of Staten Island when she was attacked by an unknown man. Small amounts of DNA mixtures were recovered from her clothing—specifically her gloves and scarf. OCME generated a "Male Donor A" profile from the mixture on the right glove based on the assumption that the mixture contained three contributors: the victim; Male Donor A; and one additional unknown contributor. Although an initial report appeared to claim that the profile was "suitable" to run in the national database, it does not appear that that was ever done. The NYPD closed their investigation in December 2010 after determining all leads had been exhausted.

3. Mr. Rodriguez was arrested for an unrelated burglary in May 2011. He promptly pled guilty to that crime, and his DNA profile was entered into the New York State DNA database.

4. About six weeks later—but a year-and-a-half after the attempted assault and more than a year after the original DNA examination—the OCME Defendants began looking again at the Male Donor A profile. They did not conduct additional lab analysis. Rather, they changed the results from the raw data they already had. First, Defendant SH conducted a technical review. Then he or she

uploaded that version of the Male Donor A profile into LINKAGE, which is OCME's internal database, in violation of a protocol requiring the profile be uploaded *before* the technical review. Next, between July 23, 2011 and August 2, 2011, Defendants made a series of unsupported manual changes to the profile itself. In other words, the profile that had already been generated was materially changed with no discernible scientific basis to a different profile at the end of the period. The purpose of the changes made by the OCME defendants can only have been to attempt to match a known profile that had been entered into the national, state or local databases. The new, altered Male Donor A profile was uploaded to "SDIS," New York State's component of the national CODIS database, and a "hit" was reported purporting to match one of the contributors to the DNA mixture from Alicia Renoj Hernandez's right glove to Alexis Rodriguez's DNA in the database. *After* the "hit" came in, Dr. O'Connor amended a document in the file originally dated February 21, 2010 to indicate that a CODIS-eligible profile had been generated.

5. The police were advised about the "hit" in late August but did not resume their investigation until almost a year later when Defendant NYPD Det. George Lopez showed Ms. Hernandez a photo array including a photo of Alexis Rodriguez. Det. Lopez manipulated the array so that Ms. Hernandez would identify Mr. Rodriguez, even though she had never actually seen him before.

6. About a month later, on August 15, 2012, Mr. Rodriguez was arrested and charged with assaulting Ms. Hernandez. On September 24, 2012, police

conducted an in-person lineup. Ms. Hernandez was unable to identify Mr. Rodriguez at the lineup and, in fact, picked out another man who was there as a "filler."

7. Mr. Rodriguez was tried before a jury in January 2014. Prosecutors presented *no* evidence purporting to link him to the crime *except* the DNA. There was no evidence he knew Ms. Hernandez, was in the area at the time of the crime, admitted knowledge of the crime to anyone, or was caught with something belonging to Ms. Hernandez. Ms. Hernandez could not identify him as her assailant.

8. The DNA was the only evidence presented at trial linking Mr. Rodriguez to the crime.

9. Before trial, OCME had reported out and claimed in discovery provided to defense counsel that Rodriguez "could be the source" of the Male Donor A contributor to the DNA mixture found on Ms. Hernandez's right glove. But at trial, the prosecutor told the jury that Mr. Rodriguez *was* the source of the DNA. The People presented purportedly scientific evidence that was in fact in flagrant violation of OCME rules and national and international standards for DNA scientists: testimony from Dr. O'Connor stating that: "in my opinion, he [Alexis Rodriguez] is the source of that DNA."

10. Based entirely on the doctored DNA evidence and Dr. O'Connor's opinion, Mr. Rodriguez was convicted of all three counts in the indictment: attempted first degree rape, attempted kidnapping in the second degree, and criminal possession of a weapon in the third degree. He was sentenced to two terms

of 15 years' imprisonment and three-and-a-half to seven years' imprisonment to run concurrently followed by 20 years' post-release supervision.

11. Mr. Rodriguez's conviction was vacated on May 24, 2021. He was fully exonerated when the indictment was dismissed in November 2023. He had served more than seven years in prison for a crime he did not commit as a result of the defendants' fabrication of DNA and identification evidence.

12. With respect to the DNA, the fabrication of evidence was not the work of analysts gone rogue, but rather was the result of an unconstitutional policy and practice of the City of New York that was the moving force behind the fabrication. Under the City's published protocols, OCME analysts routinely generated unreliable forensic DNA identifications from samples that were too small and from DNA mixtures too complex to be read without pervasive analyst judgment—while at the same time the protocols required no record of the basis for the analysts' interpretive decisions, permitted superseded interpretations to be overwritten and conflicting interpretations to be removed from case files and thereby hidden from view, all while withholding the underlying electronic data from defense lawyers and others who could serve as a check on the analysts' discretion. The City then falsely presented the analysts' subjective interpretations as objective scientific findings to prosecutors, courts, and juries. The City's unconstitutional policy created the means by which the evidence against Mr. Rodriguez was fabricated and allowed the fabrication to remain hidden for years.

## JURISDICTION

13. Plaintiff brings this action for compensatory and punitive damages, an award of costs and attorney fees, and such other and further relief as this Court deems equitable and just.

14. This action is brought pursuant to 42 U.S.C. § 1983 *et seq.* to redress the deprivation under the color of law of Plaintiff's rights as secured by the United States Constitution.

15. The Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

## VENUE

16. Venue is properly laid in the Eastern District of New York under 28 U.S.C. § 1391(b) because this is the District in which the claim arose.

## JURY DEMAND

17. Plaintiff respectfully demands a trial by jury on all issues and claims set forth in this Complaint pursuant to the Seventh Amendment of the United States Constitution and Fed. R. Civ. P. 38(b).

## PARTIES

18. Plaintiff Alexis Rodriguez, a 41-year-old man, is a citizen of the United States and of the State of Florida. At all times relevant to this Complaint, he was a resident of the State of New York or Florida. He currently resides in Florida.

19. Defendant City of New York ("the City") is a municipal corporation organized under the laws of the State of New York. The Office of Chief Medical

Examiner is an agency of the City, established by § 557 of the New York City Charter, and the New York City Police Department is likewise an agency of the City. At all times relevant to this Complaint, the individual Defendants were employees of the City acting under color of state law, and the City adopted and maintained the policies, protocols, customs, and practices under which they worked.

20. Defendant Craig O'Connor was, at all times relevant to this Complaint, a criminalist within the OCME acting under color of law and within the scope of his employment in carrying out forensic genetic analysis functions. Dr. O'Connor was the analyst who worked on the OCME case file that led to Mr. Rodriguez's wrongful conviction, reviewed all of the results, and wrote up the final report. He is currently the director of forensic biology at OCME. He is sued in his individual capacity.

21. Defendant Theresa Caragine was, at all times relevant to this Complaint, a senior official within the OCME acting under color of law and within the scope of her employment in carrying out forensic genetic analysis functions. Dr. Caragine resigned from her position as OCME Deputy Director during the pendency of Mr. Rodriguez's criminal prosecution amid allegations she had violated laboratory protocols. She is sued in her individual capacity.

22. Defendant J. Doe #1, a/k/a "SH" was, at all times relevant to this Complaint, an analyst within the OCME acting under color of law and within the scope of their employment in carrying out forensic genetic analysis functions.

Defendant J. Doe #1, a/k/a “SH” worked on the OCME case file that led to Mr. Rodriguez’s wrongful conviction. They are sued in their individual capacity.

23. Defendant Detective George Lopez was, at all times relevant to this Complaint, a duly appointed and acting officer of the New York City Police Department, acting under color of law and within the scope of his employment in carrying out law enforcement functions. Det. Lopez was assigned to investigate the January 12, 2010 attack on the complainant, Alicia Renoj Hernandez, and served as the lead investigator on the matter from that date forward. He is sued in his individual capacity.

## BACKGROUND ON DNA IDENTIFICATION SCIENCE

24. Deoxyribonucleic acid (“DNA”) is the material found in all humans and exists as a long string of chemical structures often referred to as “the blueprint of life” as it determines the makeup of every aspect of a human body.

25. DNA identification compares the genetic markers found at a set of locations—referred to as a “locus” in the singular and “loci” in plural—along a person’s DNA.

26. The locations used for DNA identification are regions where a short sequence of DNA repeats itself consecutively, known as “short tandem repeats.”

27. The value at such a location is the number of times that short sequence repeats there.

28. At each locus a person has one or two values, representing a formation of the DNA, called “alleles.”

29. The set of a person's alleles across all the tested loci is that person's DNA profile.

30. A person who inherits the same allele from both parents is described as homozygous at that locus, and the result is recorded as a single value. A person who inherits different alleles from each parent is described as heterozygous at that locus, and the result is recorded as two values.

31. As a result, a difference in the alleles recorded at a single locus in two different samples is dispositive proof that they are not from the same person. If an evidence profile records a value at a locus that a known person does not carry, or records only a single value where the known person carries two different values that are both absent from the evidence, the known person is excluded as the source of that profile.

32. It is a fundamental principle of forensic DNA comparison that if even a single allele differs between two profiles, the profiles did not come from the same person.

33. A match occurs when CODIS makes an association between two or more DNA profiles and a confirmation is performed by designated laboratory personnel from each affected lab. For the purpose of match evaluation, a high stringency match at all loci may be reviewed and evaluated by an individual who is currently or was previously a qualified DNA analyst.

34. At the casework laboratory, a match at any locus at less than high stringency must be reviewed and evaluated by a DNA casework analyst currently qualified in the technology being reviewed.

35. "Match stringency" refers to the actual locus-level stringency (low, moderate or high) for a match. The match stringency for the match between two DNA profiles is determined by the lowest locus-level stringency for all loci of the match. A Match Stringency is used to establish whether or not two DNA profiles are identified as matching. The CODIS software supports three Match Stringency levels: low, moderate, and high. Low stringency matches occur when one or more alleles match between the target and candidate profiles at a given locus. Moderate stringency matches require all alleles to match, but the target and candidate profiles can contain a different number of alleles. That is, if the target profile has three alleles and the sample profile has two, then two alleles must match. High stringency matches require all alleles to match.

36. When individual profiles have different alleles, there is an exclusion.

37. When an evidence sample contains DNA from more than one person, it is called a "mixture."

38. Interpreting a mixture is more difficult than interpreting a single-source sample, because the analyst must decide which alleles belong to which contributor, and which signals are real as opposed to technical artifacts of the testing process.

39. Unlike interpreting a single-source DNA sample, interpreting a DNA mixture requires the analyst to exercise significant judgment in determining how many separate people contributed to the mixture and which alleles belong to which contributors.

40. The reliability of a DNA profile also depends on the quantity of DNA recovered from the evidence sample.

41. When the quantity of DNA in a sample is very small—a condition referred to as a "low template" sample—the testing process does not reliably reproduce the DNA that is actually present, because random variation is magnified when fewer DNA molecules are copied and detected, and that variation distorts the resulting signal.

42. These random, quantity-driven distortions are known as "stochastic effects."

43. Stochastic effects include the failure of an allele that is in fact present to appear in the data at all (allele "drop-out"), the appearance of a peak that does not correspond to the DNA of any contributor ("drop-in"), and disproportion between the heights of the peaks at a single locus.

44. Because stochastic effects can both eliminate real alleles and introduce false ones, allele calls made from low-template samples—and particularly from low-template mixtures—cannot be relied upon to the same degree as allele calls made from a larger single-source sample.

45. The instrument used to generate a DNA profile is a genetic analyzer.

46. A genetic analyzer mechanically records a fluorescent signal for each sample and stores that signal as electronic data files.

47. From those raw data files, software generates a visual graph, called an "electropherogram," that displays the signal as a series of "peaks."

48. Each peak has objectively recorded values, including its height, measured in relative fluorescence units, and its size.

49. A peak's size is a measure of the length of the DNA fragment that produced it, expressed in base pairs and determined by comparison to a size standard run alongside the sample.

50. The size of a peak is what identifies which allele is present at a locus, because the fragment length is compared against the known reference lengths for that locus to assign the allele its value.

51. A peak's height is a measure of the strength of the fluorescent signal that produced it, expressed in relative fluorescence units, and reflects the relative quantity of that DNA fragment present in the tested sample.

52. Peak height is the value an analyst uses to determine whether a signal is a true allele rather than background noise or a technical artifact of the testing process, whether the peaks at a locus are consistent with having come from a single contributor, and, in a mixture, which contributor a given allele is more likely to be attributed to.

53. The raw electronic data and the software's associated records are the objective foundation of any DNA profile.

54. The peak heights and sizes recorded in the raw electronic data provide the information the analyst uses to determine what value—*i.e.* the number of times a short sequence repeats itself, or the number of short tandem repeats present—the analyst believes is present at each locus, an interpretive decision known as an "allele call."

55. The raw electronic data is necessary to determine whether any given allele call is supported by the underlying signal.

56. The software used to create the raw electronic data may create a time-stamped log of when each result was generated and edited.

57. Because the software generates a log automatically, rather than the analyst entering it by hand, the log can establish when each interpretive decision was made independent of the dates handwritten on the laboratory's paperwork.

58. A DNA profile developed from an evidence sample of unknown origin may be searched against government DNA databases, including the New York State DNA Databank (sometimes referred to as the State DNA Index System, or "SDIS") and the national Combined DNA Index System ("CODIS").

59. A profile must satisfy specific eligibility requirements before it may be uploaded and searched in SDIS or CODIS.

60. When a profile is searched against a database and a stored offender profile is reported to be consistent with it, the result is a database "hit" which may identify a person who was not previously a suspect.

## FACTUAL ALLEGATIONS

## I. A MAN ATTACKS ALICIA RENOJ HERNANDEZ IN STATEN ISLAND

61. On the morning of January 12, 2010, Ms. Hernandez was walking to work as a housekeeper in Staten Island.

62. Ms. Hernandez was wearing gloves on both hands, a scarf, and a jacket.

63. While she was walking, a man grabbed Ms. Hernandez from behind.

64. The man pulled Ms. Hernandez about 15 feet towards the woods on the side of the road before she fell on her back.

65. The man landed on top of Ms. Hernandez and attempted to open her jacket and proceeded to rub her thighs.

66. Ms. Hernandez asked the man to let her stand up and said she would let him do whatever he wanted.

67. The man let Ms. Hernandez stand up.

68. At some point during the incident, Ms. Hernandez noticed the man had a knife.

69. Ms. Hernandez pushed the man after he let her stand up and ran away towards the street.

70. When she reached the street, Ms. Hernandez stood in the middle of it before flagging down a car for help.

71. The car was driven by Ms. Victoria Innocente, who was accompanied by her son.

72. Ms. Innocente drove Ms. Hernandez to the school where she was dropping her son off.

73. At the school, Ms. Innocente and Ms. Hernandez got the attention of the school's safety officer.

74. The police were called to the school.

75. The police took Ms. Hernandez to her house where her sister was located.

76. Ms. Hernandez's sister took her to their church to find a translator for Ms. Hernandez.

77. The priest from their church took Ms. Hernandez and her sister to the police station.

78. At the police station Ms. Hernandez met with Det. Lopez, who speaks Spanish.

79. Ms. Hernandez provided Det. Lopez with a bag that contained the clothing she was wearing during the incident, including her gloves and scarf.

## II. NYPD CLOSES THEIR INVESTIGATION AFTER OCME FAILS TO GENERATE ANY USEFUL DNA EVIDENCE FROM THE VICTIM'S CLOTHING.

80. On or about January 27, 2010, the OCME Department of Forensic Biology received evidence in this case.

81. This case was assigned laboratory number FB10-00808.

82. Defendant Dr. Craig O'Connor was the criminalist assigned to perform the DNA testing and interpretation in this case.

83. Fabric scrapings were taken from the exterior of both Ms. Hernandez's right glove and left glove.

84. The fabric scrapings from the exterior of the right glove yielded only a small quantity of DNA—approximately 311 picograms of total DNA, shared among multiple contributors—which means that each individual contributor must therefore have contributed less than the minimum amount that the manufacturer of the test kit recommended be used.

85. On or about March 2, 2010, the electropherograms for the right glove were generated—at some point these electropherograms were printed.

86. The printouts identify the underlying data file as "Serena030210_33IR" and bear the date "Mar 02, 2010" and the notation that the software was "Licensed to ocme, ocme."

87. "Serena" is a nickname for one of the electrophoresis machines used at OCME at the time.

88. The Male Donor A profile was not uploaded to or searched against any DNA database in 2010.

89. At that time—i.e. throughout 2010—the CODIS-eligibility entry on the laboratory's tracking forms for this profile was marked "No."

90. Dr. O'Connor would eventually change the CODIS-eligibility entry on the tracking form to "Yes" on or about August 15, 2011.

91. On or about December 23, 2010, the NYPD closed the investigation because "all leads were exhausted" and "no leads or evidence were obtained by utilizing [OCME]."

## III. THE DNA INVESTIGATION RESUMES AFTER ALEXIS RODRIGUEZ'S PROFILE IS UPLOADED.

92. Alexis Rodriguez's DNA profile was uploaded to the New York State DNA Databank in May or early June 2011.

93. In July and August 2011—more than one year after the initial DNA testing was completed and about a month after Mr. Rodriguez's DNA was uploaded—Dr. O'Connor and Defendant Theresa Caragine, a senior OCME official, returned to the Male Donor A profile and made a series of changes to it, described in Section IV below.

94. On or about July 28, 2011, the electropherograms for the right glove were reprinted.

95. The reprinted pages purportedly display the same underlying data file, "Serena030210_33IR," as the March 2010 originals, and differ from those originals only in that they bear the date "Jul 28, 2011" and the notation that the software was "Licensed to caragine, ocme"—indicating that the displayed results were regenerated on software licensed to Caragine.

96. The changes O'Connor and Caragine made in July and August 2011 were made to the interpretation of the DNA data that had been generated during the original 2010 testing.

97. No new DNA analysis was performed on the samples in 2011.

98. Because no new testing was performed in 2011, the DNA data underlying the profile—including the recorded peaks and their recorded heights and sizes—did not change between 2010 and 2011. Any difference between the Male Donor A profile as originally interpreted in 2010 and the profile as reported after the 2011 changes is therefore attributable to the changes in interpretation described below, and not to any difference in the sample or in the underlying DNA testing.

99. After the changes were made, the laboratory marked the Male Donor A profile as CODIS-eligible.

100. On a "DNA / SEROLOGY SUBMISSION TRACKING FORM" the "CODIS profile?" entry was changed from "NO" to "YES," initialed by Defendant J. Doe #1 A/K/A "SH," and dated July 23, 2011.

101. On the case tracking form, the answer to "CODIS eligible profile(s) generated?" was changed from "No" to "Yes," initialed by O'Connor and dated August 15, 2011.

102. Only after the changes were made to the profile was the reworked Male Donor A profile uploaded to and searched against the databases. The profile was entered into the local database (LDIS) on August 3, 2011, and confirmed uploaded to the State database (SDIS) on August 8, 2011.

103. On or about August 9, 2011, the database search of the reworked profile produced a "hit" identifying Plaintiff Alexis Rodriguez, who had not

previously been a suspect, as a person whose stored profile was consistent with Male Donor A.

104. On August 12, 2011, the New York State Division of Criminal Justice Services transmitted the result of the database search in an email that reported a "moderate" stringency match between the altered Male Donor A profile and Mr. Rodriguez's convicted-offender profile.

105. The email characterized the match as no more than a "possible investigative lead."

106. It was sent to Defendant O'Connor and to the Richmond County District Attorney's Office.

107. The State's characterization was consistent with the incomplete, placeholder-laden Male Donor A profile described above, which could not support a high-stringency match.

108. At no point did any DNA database or the State of New York report anything stronger than a moderate-stringency possible investigative lead connecting Mr. Rodriguez to the glove. The definitive identification the jury ultimately heard came solely from Defendant O'Connor.

109. In a laboratory report dated February 11, 2013 and signed by O'Connor, OCME reported that the DNA results were consistent with Male Donor A, that Plaintiff "could be the source" of that DNA.

110. At Plaintiff's criminal trial, O'Connor testified that, although his report stated only that Plaintiff "could be the source" of the DNA, it was his opinion that Plaintiff "is the source of the DNA."

## IV. OCME DEFENDANTS MAKE SPECIFIC FABRICATED CHANGES TO THE MALE DONOR A PROFILE THAT HAVE THE EFFECT OF FALSELY INCRIMINATING ALEXIS RODRIGUEZ.

111. Each of the following acts described in this section altered the Male Donor A evidence profile in a manner that made it more incriminating with respect to Plaintiff Alexis Rodriguez.

112. As alleged below, every documented change to the Male Donor A evidence profile ran in the same direction: toward implicating Plaintiff by matching his known DNA to the evidence DNA.

113. There is no documented change that ran in the opposite direction.

### A. Manufacturing an allele at TPOX where the result had been inconclusive.

114. On the original DNA Profile Evaluation Form for Male Donor A created by OCME Defendants, the result printed at the locus called TPOX was "INC," meaning inconclusive—no allele had been called at that locus.

115. On or about August 2, 2011, the printed "INC" was struck through by hand and replaced with a called allele, "11+."

116. This handwritten change was initialed by both Caragine and O'Connor and appears to be dated August 2, 2011.

117. The effect of this change was to convert a locus that had contributed nothing to the comparison into a locus that purported to match Plaintiff, thereby

adding an apparently matching locus to the profile and making the resulting statistic more incriminating.

118. A called allele at a locus is supported only if the raw electronic data contains a genuine peak at that allele's position that meets the laboratory's own validated reporting threshold.

119. OCME Defendants failed to turn over the raw electronic data to the defense, the prosecutors, the Court, or any outside expert.

120. If revealed, the raw electronic data would not have contained a qualifying peak supporting the call of "11" at TPOX.

121. The call was therefore not a legitimate interpretation of the data but a fabricated result.

**B. Deleting alleles at D18S51.**

122. On the same DNA Profile Evaluation Form, the result printed at the DNA locus called D18S51 included the alleles 14+, 15, 16, and 20.2—that is, the alleles 14, 15, 16, and 20.2, with a "+" qualifier on the 14 signifying that another allele may be present.

123. Because a single individual has at most two alleles at a locus, the four listed alleles and the "+" indicated that the analysts had not determined which alleles were Male Donor A's at the time the printed form was generated.

124. On or about August 2, 2011, the alleles 15 and 16 were struck through by hand and deleted from the profile, leaving 14 and 20.2.

125. On or about August 2, 2011, the "+" after the 14 was also struck.

126. The changes to the DNA Profile Evaluation Form described in the preceding paragraphs were made by Defendant O'Connor.

127. Under OCME's protocols a "+" signifies that another allele may be present; striking it converted an open, non-definitive call ("14+") into a fixed, fully specified genotype.

128. The printed result had listed four candidate alleles and a "+", reflecting that the genotype of Male Donor A at this locus had not been resolved to a single pair of alleles—an unresolved, over-inclusive call drawn from the low-template[1] mixture data.

129. The changes deleted two of the four candidate alleles and removed the qualifier, resolving the call into a definite two-allele genotype, "14, 20.2"—Plaintiff's genotype at that locus.

130. There was no scientific or observational basis for the changes, which were based on exactly the same data that had been reported before.

131. The changes were made after the laboratory's technical reviews of the profile had already been completed, and no reviewer initialed approval of the change.

132. The deletions and the removal of the "+" qualifier were not made or approved as part of any documented technical review of the DNA interpretation.

133. Deleting alleles from an evidence profile removes data that could be inconsistent with the suspect. The deletion of the 15 and 16 alleles removed results

[1] Also referred to interchangeably as "high sensitivity" or "low copy number".

that could have pointed to a different contributor or tended to exclude Plaintiff as the source of the DNA.

134. The deletion of an allele (i.e. an observed peak on the electropherogram data) is a legitimate interpretation only if the peak is explainable as a technical artifact—for example, if it is below the reporting threshold or is "stutter," a known artifact that appears in a defined position relative to, and at a defined fraction of the height of, a taller "parent" peak. Whether the 15 and 16 peaks qualified as artifacts would be determined by their recorded heights in the raw electronic data.

135. OCME Defendants hid the raw electronic data from Plaintiff and his experts to cover up the fact that the 15 and 16 peaks were genuine, above-threshold alleles with no valid artifact explanation.

136. The deletions of the 15 and 16 peaks and the + were therefore fabrications rather than a legitimate interpretation.

### C. Adding "+" placeholders so the profile could not exclude Plaintiff.

137. On the DNA Profile Evaluation Form, a "+" was added by hand to the allele 12 at the locus called D13S317.

138. The change described in the preceding paragraph was made by one or more of the OCME Defendants in July or August of 2011.

139. Under OCME's protocols, a "+" signifies that another allele may be present at that locus.

140. The same permissive "+" notation appears at other loci on the form, including TPOX ("11+"), CSF1PO ("10+"), and D16S539 ("11+").

141. The effect of adding a "+" is to make the called genotype at that locus more inclusive so that whatever allele Plaintiff carries there does not produce a mismatch.

142. The cumulative effect of these additions was to make the Male Donor A profile incapable of excluding Plaintiff, regardless of his actual genotype at those loci.

143. There was no scientific or observational basis for the handwritten "+" after allele 12 at the D13S317 locus.

144. As described in the foregoing paragraphs, the "+" was manipulated in whichever direction moved the locus toward a match with Plaintiff. It was added where an open call kept him from being excluded, and struck where fixing the call helped produce a match, so that every change to a "+" made the profile more consistent with Plaintiff.

### D. Inventing a non-protocol edit code to delete peaks.

145. OCME's Editing Sheet form contains a printed legend listing the authorized codes an analyst may use to document edits to the data.

146. The code "4d – peak below stutter filter" does not appear in that printed legend.

147. On or about July 28, 2011, on the editing sheets for the right glove—the sample from which the Male Donor A profile was deduced—O'Connor handwrote the "4d" code and applied it to a detected peak in the yellow dye channel at approximately 113 base pairs.

148. These entries appear on the right-glove editing sheets and are initialed "COO 7/28/11."

149. The same invented "4d" code was applied to the left-glove editing sheet on the same date.

150. The invented code was thus used to delete peaks from both glove samples during July 2011.

151. The label "below stutter filter" asserts a specific, quantitative relationship: that a peak is small enough relative to a taller "parent" peak to be treated as the stutter artifact and removed.

152. Whether that relationship held for the deleted right-glove peak is a matter of arithmetic applied to the peak heights recorded in the raw electronic data.

153. The peak O'Connor deleted from the right-glove data under the invented "4d" code was a genuine, detected peak; the instrument recorded its size and signal.

154. Deleting that peak removed data from the right-glove profile at the interpretation stage, changing which alleles were treated as present at the affected locus.

155. The "4d" deletions on the right-glove editing sheets and the handwritten changes on the evaluation form were part of the same July and August 2011 changes to the right-glove profile, performed by O'Connor, and each moved the profile toward consistency with Plaintiff.

156. The peak deleted under the invented "4d" code was not in fact below the laboratory's validated stutter filter, and the code was created and applied as a device to suppress a genuine allele in the right-glove data rather than to document a legitimate artifact determination.

**E. Changing the profile's database eligibility from "No" to "Yes" after the work.**

157. On the "Case Tracking - NIJ Backlog Grant Case Tracking Form," the entry for "CODIS eligible profile(s) generated?" was originally marked "No."

158. That entry was overwritten to "Yes," initialed by O'Connor, and dated August 15, 2011, with the Male Donor A specimen identifier written in.

159. On the "DNA / Serology Submission and Productivity Form," the "CODIS profile?" entry was likewise changed from "NO" to "YES," and the recorded "date of last technical results" was changed from March 2010 to July 21, 2011.

160. The changes referenced in the preceding paragraph were made by defendant J. Doe #1 and initialed "SH."

161. These changes reclassified a profile that the laboratory's own records had treated as database-ineligible into one deemed eligible for upload and search.

162. The reclassification, made in July and August 2011, made it possible to search the reworked profile against the databases and to obtain the "hit" identifying Plaintiff.

163. The profile that the April 20, 2010, report had described as "suitable for entry into CODIS" was not marked as CODIS-eligible on the laboratory's

controlling tracking forms until after it had been reworked in July and August 2011.

164. Therefore, the profile was not in fact database-ready as originally interpreted, and the 2011 alterations were what rendered it eligible for the database search that identified Plaintiff.

### F. Recording the altered results on a back-dated statistics form.

165. The OCME PCR Statistics form for Male Donor A bears the date "03/22/10" and the analyst initials "COO."

166. Although it is dated March 22, 2010, the PCR Statistics form sets out the fully altered genotype—including the TPOX value of "11," the D18S51 values of "14, 20.2" with 15 and 16 removed, and the D13S317 value of "12"—that did not exist until the changes were made in July and August 2011.

167. The form dated March 2010 did not truthfully contain the results, since the results were not generated until July and August 2011.

168. The March 22, 2010, date on the PCR Statistics form therefore falsely presents the later-altered profile as though it were the original result of the 2010 testing.

## V. THE FABRICATED DNA EVIDENCE IS PRESENTED TO PROSECUTORS, WHO IN TURN USE IT AT TRIAL TO WRONGFULLY CONVICT MR. RODRIGUEZ OF THE ATTACK.

### A. OCME Defendants omitted information that may have exculpated Mr. Rodriguez.

169. The inflated, inaccurate statistic OCME reported for Male Donor A was based on only 13 of the 15 loci that were tested. The two omitted loci, called

D2S1338 and vWA, were declared "inconclusive" and excluded, even though information at those loci could have been inconsistent with the prosecution's theory that Plaintiff was a contributor.

**B. OCME Defendants inflated the random match probability statistics presented to prosecutors to mislead the jury into believing that Mr. Rodriguez was much more statistically likely to be a contributor to the right glove DNA than he actually was.**

170. The reported statistic did not account for the fact that Plaintiff was identified by searching the profile against a database containing many profiles—a circumstance that, under a correction the National Research Council recommended in its 1996 report on the evaluation of forensic DNA evidence, calls for the statistic to be discounted by the size of the database searched.

171. The SDIS database searched in 2011 contained hundreds of thousands of profiles, so applying the correction would have reduced the reported statistic by several orders of magnitude.

172. OCME did not apply that discount, and therefore further overstated the strength of the reported match.

**C. OCME Defendants prepared a misleading match chart that was presented to the jury.**

173. At Plaintiff's criminal trial, the prosecution introduced a DNA comparison chart, People's Exhibit 9, that was prepared by or with the assistance of OCME Defendants.

174. The chart displays on a single page the right-glove data, the edited Male Donor A profile, and Plaintiff's own reference DNA profile. The chart bears

two laboratory numbers, FB10-00808 and FB S12-01221, the latter reflecting the September 2012 collection of Plaintiff's reference sample.

175. The chart shows that, as against the edited Male Donor A profile, Plaintiff is included at every locus that was compared.

176. That apparent match, however, is the product of the alterations described above, which the chart demonstrates when the edited profile is compared against the pre-2011 edits right-glove data that appears in the rows above it.

177. As discussed in detail above, at the D18S51 locus, the pre-2011 edits right-glove data on the chart contains the alleles 14, 15, 16, and 20.2. Plaintiff's reference profile at D18S51 is 14, 20.2. Plaintiff does not carry the 15 or 16 alleles. The OCME Defendants struck the 15 and 16 alleles from the profile, leaving 14, 20.2—a result that matches Plaintiff exactly. The deletion thus removed the alleles in the evidence that were inconsistent with Plaintiff.

178. At the TPOX locus, the pre-2011 edits right-glove data on the chart reflects a range of peaks. The analysts first recorded TPOX as "INC" and then converted it to a called "11+". Plaintiff's reference profile at TPOX is 9, 11. The conversion turned a locus that had been treated as uninterpretable into one consistent with Plaintiff.

179. The chart further shows that OCME declared the D2S1338 and vWA loci "INC" and did not use them, even though pre-2011 edits data was obtained at both. At D2S1338, the pre-2011 edits right-glove data lists 17, 18, and 23, and the duplicate lists 17, 18, 19, 22, 23, and 25; Plaintiff's reference profile at D2S1338 is

17, 25. At vWA, pre-2011 edits data was likewise obtained; Plaintiff's reference profile at vWA is 14, 19. These were the two loci OCME set aside as "inconclusive" rather than incorporate into the comparison and the statistic.

180. The pre-2011 edits data at D2S1338 and vWA did not cleanly include Plaintiff.

181. At five of the remaining loci—D21S11, CSF1PO, D13S317, D16S539, and TPOX—the edited Male Donor A profile lists only a single called allele followed by the placeholder "Z," meaning another allele may be present. At each of those loci, the second allele in Plaintiff's reference profile is precisely the allele that the "Z" placeholder leaves open: 30.2 at D21S11, 12 at CSF1PO, 13 at D13S317, 8 at D16S539, and 9 at TPOX. The profile was thus left open-ended at each locus where a fixed, fully specified call might not have matched Plaintiff.

182. The cumulative effect of these alterations, as displayed on the prosecution's own chart, was to transform an ambiguous mixture—one that contained alleles inconsistent with Plaintiff and loci that could not be resolved—into a profile that appeared to match Plaintiff at every compared locus. Had the Male Donor A profile been searched against the databases in its original, unedited form, it would not have produced a confirmable match to Plaintiff, because the unedited profile contained alleles Plaintiff does not carry, contained no called allele at TPOX, and left the D2S1338 and vWA loci unresolved.

## VI. DEFENDANT O'CONNOR FORWARDS A FALSE "MATCH" TO PROSECUTORS, CAUSING THEM TO PRESENT FABRICATED EVIDENCE TO THE JURY LEADING TO MR. RODRIGUEZ'S WRONGFUL CONVICTION.

183. OCME's standard operating procedures prescribe the qualitative language an analyst may use in reporting a comparison, and permit an analyst to state that a person is the source of a DNA profile only when a defined statistical threshold has been met.

184. Those procedures exist so that every analyst in the laboratory reports the same result the same way, and so that the strength of a forensic conclusion is fixed by the data and the laboratory's validated standards rather than by the individual preference of the analyst who happens to take the witness stand.

185. Dr. O'Connor's written report did not state that Plaintiff was the source of the DNA. It stated that Plaintiff *could* be the source. That language reflected the laboratory's determination that the applicable, predefined threshold for a source attribution had not been met.

186. Dr. O'Connor knew the threshold had not been met. Asked at trial to explain why his report said "*could* be the source" while he had just told the jury that Plaintiff *was* the source, O'Connor testified that the report language was "based on laboratory protocols," that "there is a certain threshold of statistics that we have to meet in order for us to say in the report that they are the source of the profile," and that "as an analyst I can use my discretion to say my opinion, whether or not I think they are also the source."

187. Asked what that opinion was based on, O'Connor identified only his "own experience and knowledge of doing DNA tests and what the results are."

188. O'Connor was unable to identify any data, additional testing, statistical calculation, or provision in his laboratory's protocols that authorized the conclusion that Mr. Rodriguez was the source of the DNA on Alicia Hernandez's right glove.

189. That conclusion was false.

190. That conclusion was scientifically unsupportable.

191. O'Connor knew that conclusion was false and conveyed it to the prosecutors anyway.

192. The source attribution O'Connor conveyed was not a scientific conclusion. It was an *ad hoc* opinion that his own laboratory's written procedures did not permit him to reach, offered in place of the qualified conclusion those procedures required, and contrary to the report he had signed.

193. O'Connor conveyed that same unqualified characterization to the prosecution before trial, in the course of preparing the case, and did so knowing that the laboratory's own standards did not support it.

## VII. DR. O'CONNOR WAS AWARE THAT THERE WAS NO BASIS TO CONCLUDE THAT MR. RODRIGUEZ WAS THE SOURCE OF THE MALE DONOR A DNA OR A CONTRIBUTOR TO THE MIXTURE FOUND ON MS. HERNANDEZ'S GLOVES.

194. O'Connor personally performed and directed the alterations to the Male Donor A profile described above.

195. Dr. O'Connor knew that the TPOX locus had been recorded as inconclusive and then converted to a called allele; that two alleles had been struck from D18S51; that permissive placeholders had been added at multiple loci; and that two further loci, D2S1338 and vWA, had been declared inconclusive and excluded.

196. O'Connor knew that the association between the Male Donor A profile and Plaintiff had been generated by a search of government DNA databases for the doctored profile he had created.

197. O'Connor knew that the profile was based on a tiny sample of mixture DNA with at least three contributors and possibly many more.

198. O'Connor knew that such a sample would magnify stochastic effects and yield unreliable results.

199. For each amplification of the right-glove extract, OCME used a portion containing approximately 311 picograms of DNA.

200. Because the mixture contained at least three contributors, Male Donor A's contribution was necessarily only a fraction of that amount — and the entire input was likely substantially less than the minimum amount the manufacturer of the test kit recommended for reliable testing.

201. OCME's own records treated the sample as a low-quantity sample: the laboratory concentrated the extract and amplified it in duplicate "in accordance with OCME protocol regarding testing of low amounts of DNA."

202. At trial, O'Connor nonetheless assured the jury that the quantity of DNA was "ideal," falsely testifying that the approximately 311 picograms was "right in the ideal range."

203. That characterization apparently referred to OCME's internal working range.

204. That characterization did not account for the manufacturer's recommended minimum, for the fact that Male Donor A's share was a fraction of the input, or for OCME's own handling of the sample under its low-DNA procedures.

205. That characterization was false and misleading when made, as the incomplete profile alleged above reflects.

206. O'Connor conveyed the same characterization of the sample to the prosecution in preparing the case for trial, as part of and in support of the false claim that Mr. Rodriguez was a contributor to the mixture DNA found on Ms. Hernandez's right glove.

207. O'Connor knew that the truthful characterization of his result was, at most, that Plaintiff could not be excluded as a possible contributor to a low-template, three-person mixture—a statistical inclusion whose strength depended on the alterations he had made, and which had been produced by trawling through a massive database.

208. O'Connor knew that his result was not a definitive identification of Plaintiff as the source of the DNA.

209. O'Connor's written report stated only the qualified conclusion that Plaintiff "could be the source" of, and could not be excluded from, the DNA.

210. However, in preparing the case for trial, O'Connor communicated to the prosecution the stronger, different, and false conclusion that the DNA evidence constituted a "match" identifying Plaintiff as the source of the DNA on the right glove and that he would testify accordingly.

211. O'Connor conveyed that conclusion without disclosing that it rested on the alterations described in Section IV, without disclosing that loci that did not match Plaintiff had been excluded, and without the qualification—which was stated in his own report—that the result was *at most* a statistical inclusion of limited strength derived from a database search.

212. The characterization of the evidence as identifying Plaintiff as the source was false and materially misleading.

213. It overstated the nature and strength of the result, presented a reworked and weakened profile as a definitive identification, and concealed both the alterations and the database origin of the association.

214. O'Connor made that communication knowing it was false and misleading, or with reckless disregard for its truth.

215. As the analyst who had made the alterations, O'Connor could not have believed in good faith that his result was the definitive "match" he represented it to be.

216. At trial, O'Connor testified—in contradiction to his laboratory's standard operating procedures—that Plaintiff "is the source" of the DNA: an unqualified identification that went beyond the "could be the source" conclusion stated in his own report, as he acknowledged on the stand. Defense counsel likewise noted the discrepancy in summation, observing that O'Connor's report said Plaintiff "could be" the contributor but that "at trial he said something different, he said [Plaintiff] is the" source.

217. In routine practice, a forensic analyst's trial testimony will not exceed his written report spontaneously. A prosecutor elicits an unqualified identification from an expert on direct examination because the expert has represented, in preparation for trial, that he holds and will give that opinion.

218. In summation, the prosecutor told the jury that O'Connor "tells you it's his DNA on the glove," that "that DNA matches the defendant," and that "all of" the defendant's alleles "match the alleles on the glove," at a frequency of one in two trillion.

219. The prosecution adopted the same false characterization from the outset of trial. The prosecutor's opening statement began: "His DNA is on the glove she wore as she fought him off. His DNA skin cells on the glove she wore as she struggled against him . . . . His epithelia [sic] cells on the gloves she wore as he restrained her, tries to drag her off into the woods to rape her." The prosecutor told the jury: "Alicia Hernandez will tell you what the defendant did to her. His DNA

will tell you that he did it." The prosecution thus presented O'Connor's false conclusion to the jury before any evidence was received.

220. The prosecutor presented O'Connor's false conclusion as a definitive identification of Plaintiff as the source of the DNA—the same unqualified "match" characterization that O'Connor had conveyed and that his written report did not support.

221. O'Connor's false characterization of the DNA evidence was material.

222. The DNA "match" was the only evidence connecting Plaintiff to the crime.

223. There was no independent evidence identifying him.

224. If O'Connor had provided a truthful characterization—that the result was, at most, a database-derived statistical inclusion of limited strength that depended on undisclosed alterations—Mr. Rodriguez would not have been charged or convicted.

225. O'Connor's trial testimony that Plaintiff "is the source" of the DNA exceeded the conclusion stated in his own report, exceeded the threshold OCME's protocols require before an analyst may declare a person to be the source, and rested on the analyst's claimed "experience"—a basis that the President's Council of Advisors on Science and Technology has stated cannot establish the validity of a forensic comparison.

226. By forwarding this false and materially misleading forensic conclusion to the prosecution before trial, O'Connor caused false evidence to be used against

Plaintiff in the criminal proceeding, in violation of Plaintiff's right to a fair trial and to due process of law under the Fourteenth Amendment to the Constitution of the United States.

## VIII. AFTER THE FALSE MATCH, NYPD RE-OPENS ITS INVESTIGATION AND ATTEMPTS TO CREATE A FALSE IDENTIFICATION OF PLAINTIFF.

227. The police investigation was closed in December 2010 with leads exhausted. Alexis Rodriguez was not then a suspect and had never been connected to the complainant or to the crime.

228. The complainant's opportunity to observe her attacker was limited. She was seized from behind, and her assailant pulled her scarf across her face during the attack.

229. The complainant saw her attacker's face only briefly—for a single moment, when he stood in front of her—during an early-morning assault under overcast conditions.

230. The complainant described her attacker to the police as a male Hispanic in his twenties, of slim build, with longish hair, wearing a black hooded sweatshirt and dark jeans.

231. In an interview on the day of the attack, the complainant described her attacker as approximately 5'5" and of slim build.

232. Alexis Rodriguez is approximately six feet, one inch tall—roughly eight inches taller than the man the complainant described.

233. Alexis Rodriguez became a suspect only in or about August 2011, and only because of the fabricated DNA profile and resulting database association described in the preceding sections of this Complaint. No eyewitness, and no other evidence, had ever pointed to him.

234. Alexis Rodriguez did not commit the January 12, 2010 attack and is innocent of the offense.

235. His conviction was vacated on May 24, 2021, and the indictment was dismissed in November 2023.

236. About nine months after the DNA hit, on May 21, 2012, Det. Lopez interviewed Alexis Rodriguez at Mohawk Correctional Facility.

237. Rodriguez denied any knowledge of the incident and denied any involvement in it.

238. By the time of the photo array, Det. Lopez knew that Alexis Rodriguez was the only suspect in the case and knew Rodriguez's identity, appearance, and New York State Identification (NYSID) number.

239. On or about July 13, 2012, Det. Lopez assembled a photographic array using the New York City Police Department's Photo Manager system.

240. According to his hearing testimony, rather than use the first photos suggested by the system, Det. Lopez spent "twenty minutes, maybe half hour" to make his "own edits" to the photos that the system came up with.

241. Photo Manager is a New York City Police Department computer system containing photographs of previously arrested individuals, which assembles

arrays of six photographs based on criteria entered by the detective and displays them on a computer screen.

242. He entered Rodriguez as the subject of the array by NYSID number, and he selected the five filler photographs.

243. Photo number three in the array was Rodriguez.

244. Before showing the complainant the array, Det. Lopez told her that he would ask her three questions.

245. Det. Lopez then personally administered that same array to the complainant at the kitchen table in her home in Staten Island at around nine or ten at night.

246. Two other members of the NYPD were also present.

247. In other words, the same detective who had assembled the photo array, who knew the identity of the suspect, and who knew the suspect's position within the array, showed the array to the witness.

248. No independent or blind administrator conducted the procedure. Although two other officers—Police Officer Marin and Detective Murray—were present in the residence, none of them spoke with the complainant before or during the identification. Detective Lopez alone controlled the interaction.

249. During the approximately two years preceding the array, Detective Lopez had remained in personal contact with the complainant "from time to time."

250. Before conducting the array, Detective Lopez telephoned the complainant and told her that he was coming to show her photographs "again," and

that one of the photographs "may or may not contain the person responsible for the assault"—conveying to her that the police had developed a suspect.

251. Police did not make a recording or video of the array identification procedure.

252. The complainant selected the number-three photograph and stated that it depicted the person who had attacked her, adding that his hair was "a little different."

253. She was visibly nervous throughout.

254. On September 24, 2012, at a court-ordered corporeal lineup—a structured procedure conducted in the presence of counsel and other observers, in which Rodriguez was in the number-four position—the complainant failed to identify Rodriguez and instead selected a filler.

255. The complainant did not identify Alexis Rodriguez at trial.

256. Because Mr. Rodriguez did not commit the crime, and because the complainant had no reliable independent memory of her attacker's face capable of identifying Rodriguez, she could not and would not have selected Rodriguez in a fairly and neutrally administered identification procedure.

257. The complainant selected Rodriguez at the July 13, 2012 array only because Det. Lopez—knowing that Rodriguez was the suspect and knowing his position within the array—deliberately suggested, cued, or otherwise steered the complainant to that selection.

258. Det. Lopez knew that the identification he obtained was false and was the product of his own suggestion rather than the complainant's independent recollection.

259. Det. Lopez memorialized the false identification in official New York City Police Department records, including the Photo Array Viewing Report, the Photo Array Information Report, and the Photo Manager identification printout, and caused those records and the identification to be conveyed to the Richmond County District Attorney's Office.

260. The fabricated identification was used to establish probable cause for Rodriguez's arrest and to secure his indictment, and it materially contributed to his prosecution, his conviction, and his ensuing incarceration.

## IX. MR. RODRIGUEZ IS ARRESTED, TRIED, CONVICTED, SENTENCED AND, AFTER MORE THAN SEVEN YEARS OF ADDITIONAL INCARCERATION, EXONERATED.

261. On or about August 1, 2012, a Richmond County grand jury returned a true bill, and Mr. Rodriguez was indicted under Indictment No. 212/2012 for attempted rape in the first degree, attempted kidnapping in the second degree, and criminal possession of a weapon in the third degree.

262. On August 15, 2012, Detective Lopez placed Mr. Rodriguez under arrest on those charges.

263. Mr. Rodriguez's jury trial began on or about January 13, 2014, in the Supreme Court, Richmond County before the Hon. Robert J. Collini, J.S.C.

264. At trial, the complainant did not identify Mr. Rodriguez, the People did not introduce the photo array identification, and the People's identification case rested entirely on O'Connor's testimony that Mr. Rodriguez "is the source" of the DNA recovered from the right glove.

265. On January 23, 2014, the jury convicted Mr. Rodriguez on all three counts.

266. On May 14, 2014, the court sentenced Mr. Rodriguez to concurrent determinate terms of fifteen years on each of the two top counts and a concurrent indeterminate term of three-and-one-half to seven years on the weapon count, to be followed by twenty years of post-release supervision, and adjudicated him a second violent felony offender.

267. On May 24, 2021, the Supreme Court, Richmond County (the Hon. William E. Garnett, A.J.S.C.), vacated Mr. Rodriguez's conviction on the ground that Mr. Rodriguez was denied meaningful representation due to his lawyer's failure to investigate and challenge the DNA evidence.

268. As a result of the wrongful conviction, Mr. Rodriguez remained incarcerated for more than seven years.

269. In November 2023, the indictment against Mr. Rodriguez was dismissed, terminating the criminal proceeding in his favor.

270. Mr. Rodriguez was finally released from custody on December 28, 2021.

271. But for the Defendants' fabrication, Mr. Rodriguez's imprisonment would have ended in or about September 2014 – more than seven years before his actual release:

a. On his 2011 burglary conviction, Mr. Rodriguez was serving an indeterminate sentence of two and one-half to five years.

b. He was eligible for parole as early as November 2013 and entitled to conditional release, at two-thirds of the maximum term, in or about September 2014.

c. Because of the fabricated conviction, Mr. Rodriguez was instead held continuously.

d. He was held past his conditional release date.

e. He was held past the expiration of the burglary sentence in or about 2016.

f. Starting in 2016, the fabricated conviction was the *sole* basis for his confinement.

g. He was held past the vacatur of his conviction on May 24, 2021, after which he was remanded without bail on the reopened indictment.

h. He was finally released on December 28, 2021 after the Appellate Division, Second Department intervened, set bail, and Mr. Rodriguez posted cash bail in the amount of $2,500.

i. He was subject to electronic monitoring upon his release.

272. Mr. Rodriguez spent more than seven additional years in prison *solely* because of the Defendants' fabrication — and even after release he remained under restrictive bail conditions, including an electronic ankle monitor, until the indictment was dismissed on November 3, 2023.

273. Mr. Rodriguez was added to the National Registry of Exonerations on July 30, 2025.

## X. OFFICIAL CITY POLICIES, CUSTOMS, AND PRACTICES CAUSE THE FABRICATION OF EVIDENCE AGAINST MR. RODRIGUEZ.

### A. OCME is an agency of the City of New York, and its forensic-biology protocols are official City policy.

274. The Office of Chief Medical Examiner is an agency of the City of New York established by § 557 of the New York City Charter.

275. The Chief Medical Examiner is appointed by, and may be removed by, the Mayor.

276. Its operations are funded by the City and its employees are employees of the City of New York.

277. At all relevant times, final policymaking authority for the City over the practices of OCME's Department of Forensic Biology—including the protocols governing DNA interpretation, peak editing, documentation, technical review, database entry, and disclosure—was vested in the Chief Medical Examiner, the Director of the Department of Forensic Biology, and the Department's DNA Technical Leader.

278. The Department's written protocols and technical manuals were adopted, promulgated, and periodically revised by those officials. They were official policy of the City of New York.

279. The versions of those protocols in effect in 2010 and 2011—including but not limited to the STR analysis protocols effective March 24, 2010 and April 5, 2011—governed the original testing and the later reinterpretation of the Male Donor A profile alleged in this Complaint.

**B. The City's official policy maximized unrecorded analyst discretion and eliminated all records that would provide a check on analyst discretion.**

280. Under the City's protocols in effect at the time, an analyst interpreting DNA results was required to record his conclusions—the allele calls composing a profile—but was not required to record the basis for any call.

281. The protocols did not require an analyst to document why a call was changed.

282. The protocols did not require that superseded interpretations be preserved.

283. The protocols did not require that disagreements among analysts over the correct interpretation be noted anywhere in the case file.

284. The laboratory's software was configured so that when a report or exhibit was revised, the prior version was overwritten and destroyed. Only the most recent version survived.

285. The raw electronic data, genotyping project files, and audit logs that recorded what the instruments actually detected—and that would show what was later added, deleted, or edited—were not made part of the forensic biology case file and were not produced to prosecutors or defense counsel.

286. Rather, OCME's disclosures to prosecutors and defense attorneys were limited to conclusions and interpretations and limited numbers of electropherograms insufficient to reproduce or check the basis of the OCME conclusions and interpretations.

287. These conclusions and interpretations were routinely presented to prosecutors and defense lawyers as essentially uncontroversial scientific measurements rather than debatable deductions many steps removed from the evidence that was actually recovered.

288. Technical review was the only check on interpretation provided in the protocols.

289. The identity of the technical reviewer was documented by their initials alone.

290. The protocols required that major changes made after review be returned for further review, but OCME did not enforce that requirement: as alleged above, OCME analysts made material alterations to the Male Donor A profile after both technical reviews were complete, and no further review occurred.

291. The protocols confined peak editing to a printed list of authorized edit codes, but the list was not enforced: as alleged above, at least one OCME analyst deleted detected peaks under an invented, off-protocol code handwritten onto the editing sheets.

292. The combined effect of these policies was that a fabricated allele call and a good-faith corrected one were indistinguishable in the laboratory’s records. An analyst could delete genuine alleles, manufacture new ones, regenerate the supporting exhibits, and leave behind a case file that displayed only the final result.

293. The City then presented those results—by protocol and by practice—to prosecutors, courts, and juries as objective scientific findings.

294. These policies failed to prevent the fabrication against Mr. Rodriguez alleged above.

295. These policies supplied the means to accomplish the fabrication and the concealment that let it stand undetected for a decade.

**C. Falsifying and concealing DNA interpretations was a widespread practice at OCME, as the New York State Inspector General found.**

296. As alleged above, the New York State Inspector General found that OCME's Deputy Director of Forensic Biology, Defendant Caragine, rewrote final DNA reports with which she disagreed, reassigned cases to obtain conclusions she preferred, and directed that completed DNA comparisons be withheld from the District Attorney's Office.

297. The Inspector General found that these practices left no trace visible to the recipients of OCME's reports.

298. Because the software overwrote each prior draft, the reader of a rewritten final report had no way to know that the criminalists had ever disagreed.

299. As the Inspector General found, where documents were removed from a case file and replaced with substitutes conforming to the new conclusion, the recipients "would have no understanding that any disagreement occurred."

300. The withheld comparisons were not retained in the case file.

301. No notation reflected that they had ever existed.

302. The Inspector General further found that the protocol requiring interpretive disputes to be referred to the DNA Technical Leader for resolution was unknown to many of the criminalists it governed.

303. These practices were sufficiently persistent and widespread to constitute a custom and usage of the City carrying the force of law.

304. They were the conduct of the Department's second-ranking official; they were enabled by the record-destroying, conflict-concealing system described in the Inspector General's report; and they likely extended beyond the handful of cases the Inspector General examined.

305. The misconduct the Inspector General documented in other cases is substantially the same misconduct that occurred in Mr. Rodriguez's case, in the same period, by the same official: interpretations changed after technical review was complete, electropherograms regenerated and substituted under software licensed to defendant Caragine, conflicting results not noted anywhere, and a case file left bearing dates that concealed that anything had changed.

### D. The City, aware of the misconduct, was deliberately indifferent, failing to investigate, audit, correct, or disclose the issues at OCME.

306. OCME management learned at least by early 2013 that Dr. Caragine had violated the laboratory's dispute-resolution protocol by rewriting a final report. She was directed to submit the dispute to the DNA Technical Leader, who resolved it against her. According to the Inspector General, management took no further action.

307. Dr. Caragine assured laboratory management that in no other instance had she disagreed with another analyst and reassigned the case.

308. That assurance was false.

309. When Dr. Caragine was confronted with a second instance, she abruptly resigned in April 2013—while Mr. Rodriguez's prosecution was still pending.

310. The City and OCME defendants failed to advise the defense that one of the analysts who worked on his case had resigned amid allegations of misconduct.

311. The City never audited the casework Dr. Caragine had analyzed, reviewed, reassigned, or approved; never re-examined pending prosecutions resting on DNA conclusions she had reviewed; and never notified the prosecutors or the defendants in those cases—including Mr. Rodriguez, whose case file bore her initials, her management-review signature, and her software license.

312. The City likewise never made the external referral of these allegations of serious negligence or misconduct required of laboratories receiving federal Paul Coverdell forensic-science funding.

313. On September 12, 2013—while Mr. Rodriguez awaited trial—the New York City Council enacted Local Laws 85 and 86 of 2013 by a vote of 44 to 0, requiring OCME for the first time to adopt procedures for identifying, reporting, and reviewing incidents of laboratory error and misconduct. The Council's action was the City's own acknowledgment that no such mechanism existed. OCME did

not issue implementing root-cause-analysis guidelines until June 14, 2016, two and a half years after Mr. Rodriguez was convicted.

314. The Inspector General published the report in December 2013. Mr. Rodriguez's trial began the following month. In the weeks between, the City failed to re-examine anything in Mr. Rodriguez's case: it did not review the DNA evidence, did not disclose to him or to his prosecutors that the official whose misconduct the Inspector General had just documented had personally reviewed and modified the profile at the center of the case.

315. Instead, it permitted Defendant O'Connor to testify falsely that Mr. Rodriguez was a contributor to the DNA to the jury as though it were objective science rather than a debatable conclusion.

### E. In the alternative, the City failed to train and supervise its forensic-biology personnel in the face of an obvious risk.

316. The need to train and supervise DNA analysts in documenting the basis for interpretive decisions, recording and re-reviewing changes, preserving superseded results, and disclosing conflicting analyses is obvious. The analysts' sole product is evidence generated for use in criminal prosecutions, where an undisclosed alteration can—and here did—cause a wrongful conviction that does grievous harm to an innocent defendant and his family and community, undermining faith in the criminal justice system and the rule of law.

317. The history alleged above—final reports rewritten and overwritten, case-file documents replaced, completed comparisons withheld, a dispute-resolution protocol unknown to the analysts it governed, and management inaction upon

discovery—demonstrates that the City's training and supervision of its forensic-biology personnel were not merely inadequate but that the City was deliberately indifferent to the known and obvious risk.

### F. The City's policies were the moving force behind the violation of Mr. Rodriguez's rights.

318. The acts of fabrication alleged above were performed with the unrecorded discretion conferred by the City's policies. The acts were memorialized in incomplete records the City's policies permitted. They were concealed by the absence of any audit trail the City's policies tolerated.

319. If the City had required its analysts to record the basis for allele calls, to document and re-review post-review changes, to preserve superseded interpretations and note disagreements, or to produce the underlying electronic data with its case files to prosecutors and defense lawyers, the alterations to the Male Donor A profile would have been detected. They would not have been certified as objective science, and could not have reached Mr. Rodriguez's jury.

320. The City's policies, customs, practices, and deliberate indifference were accordingly a direct, proximate, and moving cause of the fabrication of evidence against Mr. Rodriguez, of the suppression of the data that would have exposed it, and of his wrongful conviction and imprisonment.

## XI. DEFENDANT CARAGINE COMMITTED OTHER SIMILAR ACTS OF MISCONDUCT IN HER WORK AT OCME DOCUMENTED BY THE NEW YORK STATE OFFICE OF THE INSPECTOR GENERAL.

321. Caragine resigned from OCME on or about April 19, 2013 after allegedly failing to follow laboratory protocols.

322. The NYS Office of the Inspector General ("NYS OIG") began an investigation into misconduct at OCME after The New York Times reported in January 2013 that OCME was reviewing over 800 sexual assault cases due to mishandled evidence by an analyst. NYS OIG issued a report entitled *Investigation into the New York City Office of Chief Medical Examiner: Department of Forensic Biology* in December 2013 ("OIG Rep.").

323. The descriptions of misconduct contained in the report resemble Caragine and O'Connor's misconduct in this case. In particular, Dr. Caragine rewrote a final report in 2011 because she disagreed with an analyst's findings, even though the report had undergone supervision and had been approved already. On another occasion, Dr. Caragine reassigned a case to a second analyst to redraft a final report because she disagreed with a prior analyst's determination—the initial draft was overwritten and made irretrievable while some of the first analyst's notes were removed from the file and replaced with those of the second analyst, thus "the recipients of the final report [e.g., the defendant] would have no understanding that any disagreement occurred regarding the conclusions in this case." OIG Rep. at 37. In another instance, Dr. Caragine asked an assigned analyst to conduct additional comparisons in a case after the final report had been submitted to prosecutors, but directed him to withhold the results from the prosecutors and not to amend the final report. OIG Rep. at 39.

## DAMAGES

324. Plaintiff suffered physical, psychological, economic, and emotional injuries as a result of Defendants' unlawful conduct.

325. Plaintiff suffered the loss of his freedom for more than seven additional years, personal injuries, pain and suffering, severe mental anguish, emotional distress, humiliation, indignities and embarrassment, degradation, damage to reputation, and loss of natural psychological development, all of which continue to date and are likely to continue into the future.

## FIRST CAUSE OF ACTION

## DENIAL OF FAIR TRIAL: FABRICATION OF DNA EVIDENCE

**(against all OCME Defendants)**

326. Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs as if fully set forth herein.

327. At all relevant times, the OCME Defendants were criminalists and officials of the Office of Chief Medical Examiner ("OCME") who performed, reviewed, and supervised the forensic DNA analysis and interpretation in this case at the request of, and in aid of, the New York City Police Department and the Richmond County District Attorney's Office, and in doing so acted as investigating officials under color of state law within the meaning of 42 U.S.C. § 1983.

328. The OCME Defendants fabricated evidence against Alexis Rodriguez. In July and August 2011—more than a year after the DNA testing in this case had been completed, and after the police investigation had been closed for want of

leads—the OCME Defendants modified the 2010 low-template DNA mixture attributed to "Male Donor A" using the existing raw electronic data and without conducting any retesting.

329. Those modifications consisted of a series of material alterations to the OCME forensic biology case file that were not supported by the underlying electronic data, including: converting the TPOX locus from an uninterpretable result ("INC") to a called allele; deleting alleles 15 and 16 at the D18S51 locus; adding permissive "+" placeholders signifying that additional, unobserved alleles might be present; applying an off-protocol edit code ("4d – peak below stutter filter") to multiple peaks; changing the profile's CODIS-eligibility determination from ineligible to eligible; and back-dating the "PCR Statistics" form to a date more than a year before the alterations were in fact made, as set forth in Section IV above.

330. These alterations did not reflect a good-faith scientific judgment or *bona fide* reinterpretation of the data. They were made more than a year after testing had concluded, without any retesting, in violation of OCME's own protocols, and without the technical review and consultation those protocols required; and they were accompanied by an invented edit code and a back-dated statistics form. The OCME Defendants knew that the resulting profile was not supported by the underlying electronic data.

331. The cumulative effect of the alterations was to transform an uninterpretable, CODIS-ineligible mixture into an inaccurate but reportable,

CODIS-eligible, comparison-ready DNA profile that the OCME Defendants knew was not supported by the raw electronic data.

332. The OCME Defendants altered the profile in order to produce a reportable forensic result that could be used for comparison to known individuals in DNA databases. The fabricated profile was thereafter uploaded to the local and state DNA databases and associated with Alexis Rodriguez, who had not previously been a suspect.

333. The fabricated "Male Donor A" profile was material and of a kind likely to influence a jury's determination of guilt. It was the sole evidence connecting Alexis Rodriguez to the crime and the centerpiece of the People's case at trial, where it was presented to the jury as a definitive identification of Rodriguez as the source of the DNA recovered from the right glove—a significance exceeding even the hedged "could be the source" conclusion stated in the OCME Defendants' own written laboratory report.

334. The OCME Defendants forwarded the fabricated evidence to prosecutors. They caused the altered profile, the resulting laboratory report, and the associated forensic biology case file to be transmitted to the New York City Police Department and the Richmond County District Attorney's Office, knowing and intending that they would be used in the investigation and prosecution of the person to whom the profile was matched.

335. As a direct and proximate result of the OCME Defendants' fabrication, Alexis Rodriguez was identified as a suspect, indicted, arrested, detained,

prosecuted, convicted, and incarcerated, and was thereby deprived of his liberty without due process of law.

336. Plaintiff's claim rests upon the OCME Defendants' investigative conduct in fabricating the DNA profile and forwarding it to prosecutors, and not upon testimony that any OCME Defendant gave before the grand jury or at trial.

337. The criminal proceeding terminated in Alexis Rodriguez's favor: his conviction was vacated on May 24, 2021, and the indictment against him was dismissed in November 2023.

338. At all relevant times it was clearly established that an accused has a constitutional right not to be deprived of liberty on the basis of forensic evidence that a government analyst fabricates or knows to be false.

339. No reasonable forensic analyst in the OCME Defendants' position could have believed that manufacturing an unsupported DNA profile and forwarding it for use in a prosecution was lawful.

340. The OCME Defendants acted knowingly, intentionally, and with deliberate disregard for Alexis Rodriguez's constitutional rights, entitling Plaintiff to an award of punitive damages.

341. As a direct and proximate result of the fabricated DNA, Alexis Rodriguez suffered a deprivation of liberty, years of wrongful incarceration, and severe mental anguish and emotional distress, and is entitled to compensatory and punitive damages in an amount to be determined at trial, together with attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

**SECOND CAUSE OF ACTION**

**DENIAL OF FAIR TRIAL: FABRICATION OF EVIDENCE:**

**FABRICATED PHOTO ARRAY**

**(against Defendant Det. George Lopez)**

342. Plaintiff repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

343. At all relevant times, Defendant Lopez was an investigating official acting under color of state law within the meaning of 42 U.S.C. § 1983.

344. Defendant Lopez fabricated evidence against Alexis Rodriguez. He manufactured a false eyewitness identification by deliberately suggesting, cueing, or steering the complainant to select Rodriguez's photograph during an identification procedure that Lopez administered, knowing Rodriguez to be the suspect and knowing his position within the array, and knowing that the complainant could not and would not have identified Rodriguez through a fair and neutral procedure.

345. The fabricated identification was material and was of a kind likely to influence the decision to prosecute and a jury's determination of guilt. A victim's eyewitness identification is among the most powerful and persuasive evidence a factfinder can receive, and it was so treated here.

346. Defendant Lopez forwarded the fabricated identification to prosecutors. He memorialized it in official police records—including the Photo Array Viewing Report, the Photo Array Information Report, and the Photo Manager identification printout—and caused the identification and those records to be

transmitted to the Richmond County District Attorney's Office for use in the prosecution.

347. As a direct and proximate result of Defendant Lopez's fabrication of the identification, Alexis Rodriguez was indicted, arrested, detained, prosecuted, convicted, and incarcerated, and was thereby deprived of his liberty without due process of law.

348. Plaintiff's claim arises from Defendant Lopez's deliberate manufacture of a false identification through off-the-record suggestion and steering, and not from the composition or facial suggestiveness of the photographic array. The suppression court's December 19, 2012, ruling addressed only whether the array was unduly suggestive in its composition; it did not, and on the record before it could not, adjudicate whether Defendant Lopez cued or steered the complainant during the unobserved identification procedure, which is the conduct alleged here.

349. Plaintiff's claim rests upon Defendant Lopez's investigative conduct in manufacturing the false identification and forwarding it to prosecutors, and not upon any testimony that Defendant Lopez may have given before the grand jury or at trial.

350. The criminal proceeding terminated in Alexis Rodriguez's favor: his conviction was vacated on May 24, 2021, and the indictment against him was dismissed in November 2023.

351. At all relevant times it was clearly established that an accused has a constitutional right not to be deprived of liberty on the basis of evidence that an

investigating officer fabricates or knows to be false, and no reasonable officer in Defendant Lopez's position could have believed that manufacturing a false identification was lawful.

352. Defendant Lopez acted knowingly, intentionally, and with deliberate disregard for Alexis Rodriguez's constitutional rights, entitling Plaintiff to an award of punitive damages.

353. By reason of the foregoing, Alexis Rodriguez suffered a deprivation of liberty, years of wrongful incarceration, and severe mental anguish and emotional distress, and is entitled to compensatory and punitive damages in an amount to be determined at trial, together with attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

## THIRD CAUSE OF ACTION

## VIOLATION OF DUE PROCESS: SUPPRESSION OF EXCULPATORY EVIDENCE UNDER *BRADY V. MARYLAND*

**(against all OCME Defendants)**

354. Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs as if fully set forth herein.

355. At all relevant times, Plaintiff had a clearly established right, pursuant to the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and other binding case law, to timely disclosure by the prosecution to the defense of all material information that tended to show Plaintiff's innocence

or that impeached the credibility of the prosecution's witnesses against him ("*Brady* material").

356. This rule created a duty for law enforcement personnel, including the OCME Defendants, to promptly disclose such *Brady* material to the District Attorney's Office so that it could fulfill its disclosure obligation.

357. Acting knowingly, willfully, intentionally, recklessly, negligently, or otherwise in violation of law, the OCME Defendants wrongfully withheld numerous pieces of *Brady* material from the District Attorney's Office, thereby causing the Office to fail to disclose such material to the defense.

358. The *Brady* material that was wrongfully withheld from the District Attorney's Office includes, but is not limited to, the raw electronic data described in paragraphs 53 through 57, 118 through 120, 134 through 135, and 285 above.

359. The *Brady* material also included evidence that the purported DNA match was unreliable as discussed above.

360. The *Brady* material also included evidence of the presence of specific alleles or possible alleles that would have conclusively excluded Mr. Rodriguez as a possible contributor to the DNA mixture found on Ms. Hernandez's right glove.

361. The information in question, individually and collectively, was material to the outcome of the criminal trial.

362. The OCME Defendants' failure to disclose the *Brady* material was a substantial cause of Plaintiff's conviction at trial and his resultant damages, and they are therefore liable to him pursuant to 42 U.S.C. § 1983.

363. The OCME Defendants acted knowingly, intentionally, and with deliberate disregard for Mr. Rodriguez's constitutional rights, entitling Plaintiff to an award of punitive damages.

364. As a direct and proximate result of the OCME Defendants' failure to disclose the Brady material, Mr. Rodriguez suffered a deprivation of liberty, years of wrongful incarceration, and severe mental anguish and emotional distress, and is entitled to compensatory and punitive damages in an amount to be determined at trial, together with attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

## FOURTH CAUSE OF ACTION

## MUNICIPAL LIABILITY UNDER *MONELL*: POLICY, CUSTOM, AND DELIBERATE INDIFFERENCE CAUSING DEPRIVATION OF RIGHT TO FAIR TRIAL AND DUE PROCESS

**(against Defendant City of New York)**

365. Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs as if fully set forth herein.

366. Defendant City of New York is a municipal corporation organized under the laws of the State of New York.

367. OCME and the NYPD are its agencies, and the individual Defendants were at all relevant times its employees, acting under color of state law and pursuant to the City's policies, customs, and practices.

368. As alleged in the First and Third Causes of Action, the OCME Defendants deprived Mr. Rodriguez of his rights to due process and a fair trial under the Fifth, Sixth, and Fourteenth Amendments to the United States

Constitution by (1) fabricating the DNA evidence used to convict him and (2) suppressing the raw electronic data and conflicting interpretations that would have exposed the fabrication and were therefore materially exculpatory under *Brady v. Maryland* and its progeny.

369. Those deprivations were caused by official policy of the City: the written protocols of OCME's Department of Forensic Biology, adopted by officials with final policymaking authority, which vested analysts with unrecorded interpretive discretion over low-template mixture evidence, required no documentation of the basis for or changes to allele calls, preserved no superseded interpretations, permitted the substitution and destruction of case-file records, and withheld from prosecutors and the defense the electronic data by which OCME analysts' interpretations could be checked all while certifying the results to courts and juries as objective science.

370. Independently, those deprivations were caused by customs and practices of the City so persistent and widespread as to carry the force of law: the rewriting of final DNA reports, the reassignment of cases to obtain preferred conclusions, the substitution and destruction of case-file records, and the withholding of completed comparisons from prosecutors, as found by the New York State Inspector General and alleged above.

371. Independently, those deprivations were caused by the City's deliberate indifference to the constitutional rights of criminal defendants: with actual knowledge that its Deputy Director of Forensic Biology had falsified and concealed

DNA interpretations, the City failed to investigate, failed to audit or verify her casework, failed to make corrections, and failed to disclose the misconduct before, during, or after Mr. Rodriguez's trial.

372. In the alternative, those deprivations were caused by the City's failure to train and supervise its forensic-biology personnel notwithstanding the obvious risk that unsupervised, unaudited analysts exercising unrecorded, undocumented discretion would generate false evidence that could be used in criminal trials and could, as here, lead to wrongful convictions.

373. The policies, customs, and practices alleged herein were adopted, ratified, or knowingly tolerated by officials with final policymaking authority for the City over forensic-biology practice, including the Chief Medical Examiner, the Director of the Department of Forensic Biology, and the DNA Technical Leader.

374. The City's policies, customs, practices, and deliberate indifference supplied both the means by which the evidence against Mr. Rodriguez was fabricated and the concealment that permitted the fabrication to convict him and to remain hidden for years, and were a direct, proximate, and moving cause of the violation of his constitutional rights.

375. As a direct and proximate result, Mr. Rodriguez suffered a deprivation of liberty, years of wrongful incarceration, and severe mental anguish and emotional distress, and the City is liable to him pursuant to 42 U.S.C. § 1983 and *Monell v. Department of Social Services*, 436 U.S. 658 (1978), for compensatory

damages in an amount to be determined at trial, together with attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

WHEREFORE, ALEXIS RODRIGUEZ demands judgment against all Defendants, jointly and severally, in an amount to be determined at trial and is further entitled to punitive damages against the individual defendants in an amount to be determined at trial, plus reasonable attorneys' fees, costs, and disbursements pursuant to 42 U.S.C. § 1988.

Dated: New York, New York
August 19, 2026

ZMO LAW PLLC

BY: __/s/ Zachary Margulis-Ohnuma________
ZACHARY MARGULIS-OHNUMA
353 Lexington Avenue, Suite 900
New York, NY 10016
(212) 685-0999

*Attorneys for Plaintiff Alexis Rodriguez*